**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Stephen Martin BEDDOW, Defendant–Appellant.**

No. 91–1006.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 9, 1991.

Decided Feb. 28, 1992.

Rehearing Denied March 18, 1992.

Richard S. Murray, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Grand Rapids, Mich., for plaintiff-appellee.

David I. Goldstein (briefed), Jeanice Dagher–Margosian (argued), Ann Arbor, Mich., for defendant-appellant.

Before JONES, NELSON and SUHRHEINRICH, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

Defendant Stephen Martin Beddow ("defendant" or "Beddow") appeals from a jury verdict finding him guilty of one count of conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846, three counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B), 1956(a)(2)(B) and 1957, and one count of income tax evasion in violation of 26 U.S.C. § 7201. Beddow contends on appeal that (1) there was insufficient evidence to support his convictions on two of the money laundering counts; (2) venue in the Western District of Michigan was improper; (3) the prosecutor's comments at closing argument impermissibly shifted the burden of proof; and (4) the district court erred when computing his sentence under the United States Sentencing Guidelines ("U.S.S.G.") by including a Michigan state court conviction in his criminal history. For the reasons stated below, we affirm defendant's conviction and sentence.

## I

The evidence introduced by the government at trial established that Beddow was distributing large amounts of cocaine in 1986 and 1987. The government relied primarily on the testimony of Douglas Louzon, a former associate of Beddow's, who testified that he and Beddow made several trips from their residence in Traverse City, Michigan to Macomb County, Michigan in order to purchase cocaine from defendant's source. According to Louzon, the cocaine then was sold from Beddow's home in Traverse City. Louzon also cooperated with the authorities by wearing a recording device at a meeting with Beddow on April 24, 1989. At this meeting, Louzon recorded numerous incriminating statements that Beddow made about his drug dealing activity which later were introduced at Beddow's trial.

Another government witness, Jaime Jaramillo, testified that he sold Beddow one-half ounce of cocaine on four separate occasions and Beddow's former girlfriend, Laura O'Brien, testified that she received cocaine from defendant for resale on ten separate occasions. Other witnesses alleged that Beddow sold cocaine out of his home and at a condominium he rented in Traverse City. The government also introduced records of defendant's telephone calls to his cocaine source in Macomb County.

The government produced additional evidence concerning defendant's financial ventures. The evidence established that Beddow invested in three unsuccessful business ventures: a Coney Island restaurant, a charter boat business, and the purchase of $50,000 in uncut emeralds from Brazil. These business ventures together cost defendant $100,000 in documented losses. Beddow's tax returns from 1982 through 1985 revealed little income and no assets other than his home equity. To account for his income, defendant alleged that he borrowed $35,000 from family and friends and received $40,000 from his father's estate from 1985 through 1988. Beddow had no other job or means of income during this period. Nevertheless, Beddow often carried large sums of cash and he maintained four separate safety deposit boxes at different banks. In order to make his income and assets more difficult to trace, Beddow allegedly obscured his ownership of the charter boat business and the emeralds purchased in Brazil by using "front men" to carry out these ventures. Beddow's efforts to conceal his income were not entirely successful and the emerald transaction eventually led to the present money laundering charges.

The emerald transaction began when Chris Perry, a Traverse City businessman, was approached by Beddow's accomplice and "front man," Rick Gray, in November 1987 about a joint venture selling uncut gems. Perry initially was responsible for setting up the importation and marketing of the gems but he withdrew from the venture in 1988. On April 21, 1988, Gray purchased $29,000 in traveller's checks at a Comerica Bank in Troy, Michigan. Gray filled out and signed the required currency transaction report ("CTR") and an international transportation of currency report when he purchased the traveller's checks. Beddow did not sign either of these documents.

Beddow and Gray traveled to Brazil together in May 1988. The government introduced evidence that Gray carried $47,000 in cash and traveller's checks when he and Beddow left Detroit Metro Airport for Brazil. In Brazil, Gray and Beddow purchased 8,000 carats of uncut emeralds which were brought back to Chicago and then finally to Traverse City. Beddow was the source of the cash that Gray used to purchase the traveller's checks and the emeralds.

On November 9, 1988, the emeralds were seized when Beddow and Gray attempted to sell them to undercover federal agents and both men were arrested. Beddow was carrying a handgun at the time of his arrest. On September 21, 1990, Beddow was convicted in Michigan state court for carrying a concealed weapon. Thereafter, Beddow was convicted of the present federal charges in the United States District Court for the Western District of Michigan. At

sentencing, the district court included defendant's Michigan state court conviction in his criminal history. This appeal followed.

## II

■ Beddow first contends that the district court erred by denying his Fed. R.Crim.P. 29 motion for acquittal because there was insufficient evidence to show that he had the requisite intent to commit the money laundering offenses charged in Counts 3 and 4 of the indictment. Count 3 alleged that defendant gave Rick Gray $29,000 in drug money to finance the emerald deal, in violation of 18 U.S.C. § 1956(a)(1)(B).[1] Count 4 alleged that defendant used Rick Gray to transport money derived from illegal drug sales out of the country when he and Gray traveled to Brazil, in violation of 18 U.S.C. § 1956(a)(2)(B).[2] Under the Money Laundering Control Act, the government had the burden of proving beyond a reasonable doubt that Beddow knowingly conducted a financial transaction with the proceeds of drug distribution and that he did so with the intent to conceal the nature or source of those proceeds or with the intent to avoid a transaction reporting requirement. *United States v. Blackman,* 904 F.2d 1250, 1256 (8th Cir. 1990).

■ We review the denial of a Rule 29 motion for judgment of acquittal due to insufficient evidence under the same standard as the district court. *United States v. Adamo,* 742 F.2d 927, 932 (6th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985). Evidence is sufficient to support a criminal conviction if, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This court "will reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole, and ... this rule applies whether the evidence is direct or wholly circumstantial." *United States v. Stone,* 748 F.2d 361, 363 (6th Cir.1984). It is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt. *Adamo,* 742 F.2d at 932.

We conclude that substantial evidence supports the jury's verdict on the money laundering charges. The government produced tape recorded statements that Beddow made to Douglas Louzon, stating that he invested $45,000 worth of drug proceeds

---

**1.** 18 U.S.C. § 1956(a)(1)(B) provides in pertinent part:

§ 1956. Laundering of monetary instruments.

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
(B) *knowing that the transaction is designed in whole or in part* —
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
(ii) to avoid a transaction report requirement under State or Federal law,
shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. (Emphasis added).

**2.** 18 U.S.C. § 1956(a)(2)(B) provides in pertinent part:

§ 1956. Laundering of monetary instruments.
(2) Whoever transports, transmits, or transfers or attempts to transport, transmit, or transfer monetary instrument or funds from a place in the United States to or through a place outside the United States to a place in the United States from or through a place outside the United States—
(B) *knowing that the monetary instrument or funds involved in the transportation represent the proceeds of some form of unlawful activity and knowing that such transportation is designed in whole or in part* —
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
(ii) to avoid a transaction reporting requirement under State or Federal law,
shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, whichever is greater, or imprisonment for not more than twenty years, or both. (Emphasis added).

in "stones" and $60,000 worth of drug proceeds in his charter boat. A rational jury could find from these statements that Beddow knew that the funds involved in the emerald deal were the proceeds of unlawful activity.

The jury could also conclude that Beddow intended to disguise his ownership of the money invested in the emeralds and avoid the transaction reporting requirement. Beddow claims that there is no evidence that he intended to launder any money and that he merely loaned Gray the money to purchase the emeralds. We disagree. Beddow accompanied Gray to Brazil with the money, returned to Chicago from Brazil to sell the gems, guarded the gems with a gun, negotiated the sale of the gems with Harold Heald and Jaime Jaramillo, claimed the gems were his property, and transported the gems back to Traverse City from Chicago. The jury could infer from these facts that Beddow was the true owner of the emeralds and that Beddow used Gray as a "front man" to disguise his ownership and evade the transaction reporting requirement. Also, the evidence of Beddow's convoluted financial dealings with his banks and his charter boat business further support a conclusion that he intended to disguise the illegal source of his money. Consequently, a rational jury could find that Beddow violated 18 U.S.C. §§ 1956(a)(1)(B) and 1956(a)(2)(B) by concealing the source of his money and using Gray to avoid filing the required CTR in his own name. *See Blackman,* 904 F.2d at 1257; *United States v. Massac,* 867 F.2d 174, 177–78 (3d Cir.1989). We hold that there was sufficient evidence to support defendant's convictions on Counts 3 and 4.

### III

■ Beddow next challenges venue in the Western District of Michigan on the money laundering counts. Venue lies in any district in which the offense was committed. Fed.R.Crim.P. 18; *United States v. O'Donnell,* 510 F.2d 1190, 1192 (6th Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). Unless the statute violated prescribes the venue, offenses committed in more than one district "may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a).[3] The government bears the burden of proving by a preponderance of the evidence that venue was proper as to each count. *United States v. Barsanti,* 943 F.2d 428, 434 (4th Cir.1991), *petition for cert. filed,* (Dec. 17, 1991). This court determines the proper venue by "a substantial contacts rule that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding...." *United States v. Williams,* 788 F.2d 1213, 1215 (6th Cir.1986) (*quoting United States v. Reed,* 773 F.2d 477, 481 (2d Cir.1985)).

■ Beddow argues that the continuing offense statute, 18 U.S.C. § 3237(a), is inapplicable because money laundering is not a continuing offense. Beddow's argument focuses too narrowly on the act of filing the required CTR disclosures without considering that transporting as well as procuring the money illegally are essential elements of money laundering. *See United States v. Donahue,* 885 F.2d 45, 50 (3d Cir.1989) (venue on charge of transporting currency without filing proper disclosure appropriate where transport began, i.e., district where defendant boarded flight from Pennsylvania to Miami, prior to leaving country from Miami); *United States v. Greene,* 862 F.2d 1512 (11th Cir.) (venue

---

**3.** 18 U.S.C. § 3237(a) provides:

Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

proper in the Middle District of Florida for making false statements to bank in New York because offense was initiated in Florida), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989). We hold that Beddow's money laundering offenses are cognizable under 18 U.S.C. § 3237(a) as continuing offenses.

 Beddow contends that venue in the Western District of Michigan was improper for the money laundering charges because the purchase of the traveller's checks at the Comerica Bank and their transportation out of the country from Detroit Metro Airport both occurred in the Eastern District. Under section 3237(a) venue is proper in any district where any part of the money laundering scheme occurred. In the present case, it is clear that the funds involved in both money laundering counts were acquired by selling drugs in the Western District of Michigan. Also, Count 4 involved travel that originated in Traverse City. We conclude that these acts were essential elements of the money laundering offenses and that they were sufficient to confer venue under section 3237(a). *See United States v. Hernando Ospina*, 798 F.2d 1570, 1577 (11th Cir.1986) (venue proper under 18 U.S.C. § 3237(a) in the district where the cash was accumulated in a prosecution for failure to file a CTR). Although venue may have been proper in the Eastern District, venue is not limited to a single district when a crime implicates more than one location. *Williams*, 788 F.2d at 1215. Under the substantial contacts test used in the Sixth Circuit, venue was proper in the Western District of Michigan.

### IV

 Defendant attacks the prosecutor's comment about the failure of his brother, Jeffrey Beddow, to appear and testify in support of his claim that Jeffrey Beddow loaned him $32,000. Beddow contends that this comment impermissibly shifted the burden of proof. The prosecutor made the comment during closing argument in response to defense counsel's claim that defendant's income could be explained by this loan.[4] Defense counsel objected to the prosecutor's comment below. The district court ruled the comment was proper given defense counsel's prior closing statement raising the issue of Jeffrey Beddow's alleged loan to defendant.

In *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court held that improper remarks by a prosecutor did not constitute per se reversible error when they were in response to defense counsel's provoking remarks. In such instances a court "must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly." *Id.* at 12, 105 S.Ct. at 1044. In making that determination, the conduct of defense counsel as well as the nature and extent of the prosecutor's response are relevant. *Id.; see also United States v. Robinson*, 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988).

On this record, we agree with the district court that the prosecutor's comment was a permissible response to defense counsel's closing argument. The remark was minimal in its impact compared to the other evidence of guilt and the comment did not directly implicate the defendant's failure to produce exculpatory evidence. Rather, the prosecutor focused on the quality of the defendant's evidence compared to the government's evidence. *See United States v. Drake*, 885 F.2d 323, 324 (6th Cir.1989) (not every statement highlighting the fact that the defense produce no contrary evidence is improper; a prosecutor must be able to summarize the evidence and comment on its quantitative and qualitative significance), *cert. denied*, 493 U.S. 1049, 110 S.Ct. 852, 107 L.Ed.2d 846 (1990).

---

**4.** Beddow argued that Frank Aguilera loaned him a large sum of money to buy gems. Beddow claimed that his brother originally planned to loan him the money but could not because of complications. The prosecutor responded to this claim as follows:

The idea that Frank Aguilera's money might have been switched with Jeff Beddow's money and that Jeff Beddow produced the $32,000 to pay Frank back, *where is Jeff Beddow? Has Jeff Beddow been called as a witness?* (Emphasis added).

Moreover, considered in light of the context of the arguments and the entire trial, any prejudice to the defendant was minimal and does not warrant reversal.

## V

Finally, Beddow raises several challenges to the propriety of the district court's inclusion in his criminal history of his state conviction for carrying a concealed weapon. We address each of defendant's challenges in turn.

Beddow first contends that the conviction is not final because it is on appeal in state court. A conviction is considered final for criminal history purposes at the time of the trial court's determination of guilt. *United States v. Mackbee*, 894 F.2d 1057 (9th Cir.), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2574, 109 L.Ed.2d 755 (1990). Under U.S.S.G. § 4A1.2(a)(1), a "prior sentence" is defined as "any sentence *previously imposed upon adjudication of guilt,* whether by guilty plea, trial, or plea of nolo contendere." (Emphasis added). This language contains no requirement that a sentence be upheld on appeal prior to inclusion in the criminal history calculation. *Mackbee*, 894 F.2d at 1058. The fact that Beddow has appealed his concealed weapon conviction thus has no bearing on the propriety of his sentence.

Beddow next argues that the state case and the present case are "related cases" under U.S.S.G. § 4A1.2(a)(2), which states that "[p]rior sentences imposed in related cases are to be treated as one sentence for purposes of the criminal history." The commentary to U.S.S.G. § 4A1.2, Application Note 3, suggests that prior "[c]ases are considered related if they (1) occurred on a single occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing." Beddow contends that his possession of a concealed weapon and the money laundering offenses "occurred on a single occasion" because he was arrested for both crimes on November 9, 1988, and that both offenses were part of "a single common scheme or plan."

This argument illustrates a common misconception about the term "related cases" in § 4A1.2(a)(2). As the Tenth Circuit recently explained: "The question of 'related cases,' referred to in § 4A1.2(a)(2), applies to the relationship between prior sentences, not to the relationship between prior sentences and the present offense." *United States v. Walling*, 936 F.2d 469, 471 (10th Cir.1991) (citations omitted). Thus, section 4A1.2(a)(2) only requires counting two or more prior related sentences as one sentence in a defendant's criminal history when the prior sentences were related to each other. This section does not apply where, as here, there is only one prior sentence. *See United States v. Miller*, 903 F.2d 341, 343 (5th Cir.1990).

Beddow also argues that because the state offense arose simultaneously with the federal money laundering charges, it cannot be considered a *prior* sentence at all. The commentary to § 4A1.2 explicitly addresses this issue in Application Note 1, which provides:

> 1. *Prior Sentences.* "Prior sentence" means a sentence imposed prior to sentencing on the instant offense, other than a sentence for conduct that is part of the instant offense. See § 4A1.2(a). *A sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence* if it was for conduct other than conduct that was part of the instant offense.

U.S.S.G. § 4A1.2, comment. (n. 1) (emphasis added). The clear import of Application Note 1 is that "the chronology of sentencing rather than the commission of the crimes [is] controlling." *Walling*, 936 F.2d at 471; *see also United States v. Hoy*, 932 F.2d 1343, 1345 (9th Cir.1991) ("[T]he Sentencing Commission plainly intended for sentences imposed at any time prior to sentencing for the instant offense ... to be included in a defendant's criminal history."). Since Beddow was sentenced for his concealed weapon conviction prior to sentencing for the instant offenses, we conclude that it was proper to count this conviction as a "prior sentence."

■ However, Beddow raises another objection to including his prior sentence for carrying a concealed weapon in his criminal history. As noted above, section 4A1.2(a)(1) instructs that in calculating a defendant's prior criminal history a judge may count as a "prior sentence" only a "sentence previously imposed ... *for conduct not part of the instant offense.*" (Emphasis added). Beddow contends that he carried the gun to protect his investment in the gems and that therefore the "prior sentence" was imposed for conduct which was "part of the instant offense" under U.S.S.G. § 4A1.2(a)(1).

The definition of "conduct not part of the instant offense" presents an issue of first impression in this circuit.[5] However, in *United States v. Banashefski*, 928 F.2d 349 (10th Cir.1991) the Tenth Circuit considered a similar issue. Banashefski was arrested for driving a stolen car and a shotgun was found in the car's trunk. He was convicted in state court of possessing a stolen car. The Tenth Circuit then upheld the use of the state stolen vehicle conviction to enhance Banashefski's federal sentence for being a felon in possession of a firearm. The *Banashefski* court stated that the dispositive fact in its analysis was that the defendant's possession of the car was "severable" from his possession of the firearm. *Id.* at 352; *see also Walling*, 936 F.2d at 471 (prior counterfeiting conviction properly included in defendant's criminal history because it was a severable instance of unlawful conduct from a later counterfeiting charge).

■ We agree with the Tenth Circuit that the appropriate inquiry is whether the "prior sentence" and the present offense involve conduct that is severable into two distinct offenses. This is necessarily a fact-specific inquiry that involves more than just a consideration of the elements of the two offenses. *Banashefski*, 928 F.2d at 352 n. 4. Factors such as the temporal and geographical proximity of the two offenses, common victims, and a common criminal plan or intent also must be considered. *Cf. United States v. Shewmaker*, 936 F.2d 1124, 1129 (10th Cir.1991) (discussing similar factors under the "common scheme or plan" language of U.S.S.G. § 4A1.2, comment. (n. 3)), *cert. denied,* —— U.S. ——, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992). We review such factual findings under the clearly erroneous standard. *See* 18 U.S.C. § 3742(e)(4); *United States v. Kappes*, 936 F.2d 227, 231 (6th Cir.1991) (clearly erroneous standard applied to review of district court's conclusion that two prior offenses arose out of the same course of conduct under relevant conduct provision of the Guidelines).

In this case, we agree with the district court that Beddow's carrying of a concealed weapon was conduct severable from his money laundering offenses. The district court stated:

I find as a matter of law that the firearms violation here is not part of the instant offenses which the Court has before it. While in a time frame sequence it would appear to be somewhat contemporaneous with some of the ongoing events, it appears that, for instance, as to Counts 2, 3, and 4, that they occurred, if anything, at the tail end of that particular occurrence.

It appears further that in Count 7 of the indictment, that covers a whole year's time, and to say that anything occurring within that year was related wouldn't be reasonable as well. Additionally, this Court is not convinced that the carrying of the concealed weapon was inextricably intertwined in the offenses. Counts 2, 3, 4 and 7 that are before this Court; that they are distinctly different in their very nature.

5. In *United States v. Crosby*, 913 F.2d 313 (6th Cir.1990), the defendant appealed the use of his state court drug conviction as a "prior sentence" to enhance his federal sentence for maintaining a continuing criminal enterprise ("CCE"). The conduct for which Crosby was convicted in state court was later used as an element of the CCE charge. The *Crosby* court stated that "[u]nder a natural reading of the guidelines, conduct that is an element of an offense would normally be considered 'part' of that offense." Nevertheless, this court affirmed the CCE conviction and sentence because the situation was specifically allowed in the Guidelines. *See id.* at 314–15. Consequently, *Crosby* does not control the outcome in the present case.

Accordingly, the Court believes under Section 4A1.1(b) that the scoring is appropriate in Paragraph 51 of this state charge, and that for purposes of scoring it is an unrelated matter.

(Jt.App. at 155–56). The district court's factual findings about the timing of the two offenses are not clearly erroneous.

The crimes here involved different criminal conduct that harmed different societal interests. Carrying a concealed weapon harms society by the potential for violence it creates and the danger it presents to law enforcement officials and the public. In contrast, money laundering harms society by "dispers[ing] capital from lawfully operating economic institutions to criminals in and out of the country." *United States v. Gallo*, 927 F.2d 815, 822 (5th Cir.1991). Each offense involved severable instances of unlawful conduct: one the carrying of a concealed firearm and the other the transporting of gems purchased with illegally derived funds.

Moreover, we agree with the district court that the offenses occurred at different times and places. Defendant transported emeralds into the country in order to launder drug proceeds in April and May 1988. Six months later he carried a gun when he attempted to sell the emeralds. The money laundering offenses were complete at the time Beddow acquired the emeralds with the intent to conceal money that he knew was illegally derived. That Beddow was not arrested until six months later while carrying a concealed weapon does not make the offenses related for purposes of sentencing. *See United States v. Garcia*, 909 F.2d 389 (9th Cir.1990).

In *Garcia* the defendant was arrested for carrying a small amount of methamphetamine and a bundle of counterfeit bills together in a small bag. The Ninth Circuit affirmed Garcia's federal sentence for possession of counterfeit currency and included in his criminal history the state conviction for possession of the methamphetamine. The court held that Garcia's possession of the methamphetamine on the occasion of his arrest for possession of the counterfeit notes in no way made the carrying of the methamphetamine conduct that was "part of the instant offense" of possessing counterfeit currency. *Id.* at 392.

Similarly, the present case involves the unlawful possession of a firearm discovered on the occasion of Beddow's arrest on money laundering charges. *Garcia* supports treating the two instances of conduct here as severable despite their coincidence in time. Although Beddow may have carried the gun to protect the emeralds, we believe that such an incidental act does not fall under the definition of "conduct that is part of the instant offense" under U.S.S.G. § 4A1.2. Adopting such a broad interpretation of offense conduct would render almost every crime committed contemporaneously with some other offense part of that offense under U.S.S.G. § 4A1.2. We therefore conclude that the district court did not err by including Beddow's Michigan state court conviction in his criminal history.

AFFIRMED.