UNITED STATES of America, Plaintiff

v.

Donald M. HEAVRIN, Defendant

No. CRIM. A. 3:99CR113–H.

United States District Court,
W.D. Kentucky.

April 25, 2001.

Marisa Ford, Jim Lesousky, Louisville, KY, for Plaintiff.

Scott C. Cox, Rob Eggert, Louisville, KY, for Defendant.

## MEMORANDUM ON ACQUITTAL

HEYBURN, District Judge.

Defendant, Donald M. Heavrin, an attorney, was charged in the Third Superceding Indictment with 14 separate criminal counts, all of which relate to an alleged scheme to defraud the bankrupt estate of Triple S Restaurants, Inc. ("TSR") of over $252,000 in life insurance proceeds and deceive the United States Bankruptcy Court. Heavrin admits that one purpose of his actions during the summer of 1994 was to obtain these proceeds for himself and his stepsister through his father's trust. The essential question of this case is whether the means he used to achieve this admitted goal amounts to a crime.

Trial commenced on October 23, 2000. At the close of all proof, Defendant moved under Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal of all charges. On November 2, 2000, after extended discussion, the Court sustained those motions for reasons stated on the record. In view of subsequent motions, their relevance to the acquittal, and the unusual nature of this case, the Court now sets forth its conclusions more succinctly and with greater care.[1] This Memorandum on Acquittal supercedes the Court's earlier oral statement and is intended to present the Court's revised and final reasons for entering the judgment of acquittal.

### I.

The process for deciding motions for judgment of acquittal under Rule 29 are well understood. The Court must view all the evidence separately and together in a light most favorable to the prosecution, drawing all permissible inferences in favor of the government, and then decide whether any rational jury could find the essential elements of the crimes beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Hernandez,* 227 F.3d 686, 694 (6th Cir.2000).

In reviewing the evidence, the Court must proceed with great care. For instance, though the Court draws all inferences in favor of the government, these inferences must be drawn from facts which a reasonable jury might believe as true. *Sullivan v. Louisiana,* 508 U.S. 275, 277–78, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *United States v. Ward,* 197 F.3d 1076, 1079 (11th Cir.1999). This is understandable, as a man's liberty should not be placed in jeopardy by an inference drawn from mere

---

1. Heavrin has filed a motion for reimbursement of his attorney's fees and costs under the Equal Access to Justice Act. The Court will consider that motion by a separate Memorandum Opinion.

speculation or conjecture. *United States v. Villegas,* 911 F.2d 623, 628 (11th Cir. 1990) (citing *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 116 (3rd Cir.1980)). On the other hand, it is well settled that circumstantial evidence alone may sustain a conviction, even if the evidence does not exclude other reasonable hypotheses that show the defendant's innocence. *United States v. Beddow,* 957 F.2d 1330, 1334 (6th Cir.1992).

## II.

With these principles in mind, the Court examines the evidence presented at trial viewed most favorably to the government. In subsequent sections of this Memorandum, the Court will consider the legal consequences of the reasonable inferences drawn from this evidence.

In 1988, Michael Macatee and Robert Harrod formed TSR, a Kentucky corporation. TSR operated Sizzler Restaurants. Harrod, TSR's president, and Macatee, TSR's secretary, each owned 40 percent of TSR's stock, while two other investors owned the remaining 20 percent. Heavrin, Harrod's step-son, served as the attorney for TSR from its inception.

Shortly after Harrod and Macatee formed TSR, they sought financing from McDonnell Douglas Finance Corporation ("MDFC"). MDFC agreed to loan TSR approximately $3.5 million to obtain franchise rights to operate eight to ten additional Sizzler restaurants. As additional security for the loan, MDFC required TSR to purchase "key man" life insurance policies on Macatee and Harrod. TSR, Harrod, and Macatee were jointly and severally liable to MDFC on the loan.

Harrod's insurance was a single policy, originally issued by Trans America, but converted in 1991 to a $2 million policy issued by Jackson National Life Insurance Company ("Jackson National"). Macatee was insured by four separate policies, each in the amount of $500,000. The Jackson National policy on Harrod's life is at issue here (the "Harrod Policy"). TSR was both the owner and beneficiary of the Harrod Policy. On November 21, 1991, Harrod and Macatee, on behalf of TSR, executed a collateral assignment to MDFC as security for its indebtedness to MDFC (the "Collateral Assignment"). The Collateral Assignment transferred to MDFC all rights, title, and interest in the Harrod Policy. Since the assignment was collateral and not general, TSR retained the rights to any policy proceeds remaining after satisfaction of the MDFC debt. However, until the debt was satisfied, MDFC had the exclusive right to collect the Harrod Policy proceeds. TSR, as the owner, retained the right to change the beneficiary. TSR's limited right did not affect MDFC's other rights under the Harrod Policy.

By the summer of 1992, TSR faced severe financial problems. Harrod thought that TSR might need to file for bankruptcy. Heavrin persuaded Harrod that such a course of action was premature. Heavrin then began to negotiate with creditors to restructure TSR's debts. Shortly thereafter, in September 1992, Harrod created the Robert Harrod Irrevocable Trust (the "Harrod Trust") and transferred his shares of TSR stock to the Harrod Trust. Harrod was the trustee of the Harrod Trust until his death, at which time Heavrin and Bobbie Bridges, Heavrin's step-sister, became co-trustees. Heavrin and his step-sister were co-beneficiaries of the Harrod Trust and each would receive fifty percent of the trust assets.

In late 1992, MDFC restructured its loan and reduced TSR's monthly payments. Despite this restructuring, TSR continued to experience significant financial problems. In late 1993, TSR stopped making the premium payments on both the

Harrod and Macatee policies and MDFC took over the premium payments to prevent their lapse.[2] About the same time, Harrod became increasingly upset with MDFC's treatment of TSR. Heavrin initiated discussions concerning various legal claims of TSR and Harrod against MDFC. In March 1994, Harrod was diagnosed with lung cancer and he immediately began treatment. Harrod renewed his insistence that Heavrin pursue Harrod's claims against MDFC for the benefit of Heavrin and his step-sister. Though Heavrin served as TSR's counsel, he also stood to gain personally from the settlement demands on behalf of Harrod individually.

On June 17, 1994, TSR transferred ownership of the Harrod Policy to the Harrod Trust. As company president, Macatee authorized the transfer on behalf of TSR. TSR also authorized a change in the beneficiary from TSR to the Harrod Trust. Heavrin recommended the transfer and prepared the legal documentation for the transaction. At the same time Macatee transferred his life insurance policies from TSR to a similar trust.

In June 1994, Heavrin continued to press his step-father's various legal claims against MDFC. Heavrin pursued these claims throughout the summer. By August 1994, MDFC had tentatively agreed that at Harrod's death, it would pay $250,000 to the Harrod Trust from the proceeds of the Harrod Policy. MDFC also agreed to release Harrod of all further individual liability to MDFC. Heavrin did not negotiate a release or settlement as to any of TSR's potential claims. Some details remained unresolved.

In the midst of the negotiations, Robert Harrod died on September 2, 1994. Several weeks after Harrod's death, Bell Atlantic, a large judgment creditor, executed a lien on various TSR bank accounts, essentially stopping normal corporate operations.[3] At this point, bankruptcy became almost unavoidable. Heavrin recommended to Macatee that TSR file for bankruptcy and that it hire David Chinn as bankruptcy counsel. Chinn rented an adjacent office from Heavrin and worked with Heavrin previously on legal matters. TSR retained Chinn, who consulted with Macatee and TSR's accountants to prepare the bankruptcy petition. Heavrin continued to act as counsel for TSR in all other matters.

On September 30, 1994, TSR filed a Chapter 11 petition in the United States Bankruptcy Court for the Western District of Kentucky. Chinn and Macatee each signed the petition. The Chapter 11 petition and schedules neither listed nor otherwise disclosed the June 1994 transfer of the Harrod Policy from TSR to the Harrod Trust or the transfer of the Macatee Policies from TSR to the Macatee Trust.

During September and October, Heavrin continued to negotiate the final details settling Harrod's claims against MDFC. As a result of those negotiations, MDFC ultimately agreed to authorize a payment to the Harrod Trust from the Harrod Policy proceeds. In November 1994, MDFC and Heavrin, as trustee of the Harrod Trust, agreed on the terms of the distribution. With this agreement in place, Jackson National forwarded a $252,712.33 check to Heavrin as trustee of the Harrod Trust and wired the remaining proceeds of the

---

2. MDFC did not automatically continue premium payments on any of the policies. It analyzed the potential costs and benefits, which produced mixed results. MDFC allowed one of the Macatee policies to lapse.

3. Bell Atlantic actually obtained its judgment on June 2, 1994 in the amount of $2,000,000.

Harrod Policy, over $1,750,000, to MDFC. About the same time, MDFC filed a claim with the bankruptcy court, listing its secured claims without deducting or referring to any monies received from the Harrod Policy.

On December 13, 1994, the bankruptcy court converted the TSR bankruptcy from a Chapter 11 to a Chapter 7 proceeding. TSR filed a new Chapter 7 petition and additional schedules. Neither TSR nor Chinn listed the transfer of the Harrod Policy to MDFC on the new filings. Likewise, Heavrin said nothing about the receipt of $252,712.33 from the Harrod Policy. Heavrin used approximately $100,000 of the proceeds to loan funds to Total Vend, Inc., a vending machine supply company in which he owned approximately forty percent of the shares at the time. In the spring of 1995, MDFC finally amended its secured claim to reflect the receipt of $1,750,000 on the Harrod Policy.

Sometime after 1995, Baxter Schilling, in his capacity as Trustee for the bankrupt estate of TSR, took a variety of legal actions against Heavrin to recover the MDFC insurance proceeds and to disgorge well over $100,000 of Heavrin's legal fees charged to TSR. Thereafter, Heavrin and Schilling actively and continually engaged in legal warfare. The Trustee charged Heavrin with all manner of Bankruptcy Code violations. Heavrin charged conflicts of interest and bias against both the Trustee and various bankruptcy judges. Over the next few years these legal proceedings remained bitter and personal on both sides.

On September 22, 1999, the grand jury returned a five-count indictment that charged Heavrin with transferring, concealing, and laundering money that should have been part of the bankrupt estate. On May 17, 2000, just over three weeks before the then scheduled trial date, the grand jury returned a superceding indictment that added counts of concealment, money laundering, perjury, and contempt. When trial finally began on October 23, 2000, a Third Superceding Indictment (the "Indictment"), with only minor alterations, listed the criminal charges.

■ On different occasions and even in different proceedings, the government asserted or suggested a variety of facts and theories related to this case. The Court will attempt to address as many of those theories as possible, recognizing that the government itself may not consider all of them equally meritorious. For obvious reasons, any evidence that was not introduced at trial is irrelevant to the determination of whether the government met its burden of proof, regardless of whether this extraneous information appears favorable or unfavorable to Heavrin.

III.

■ Count One of the Indictment charges Heavrin with knowingly and fraudulently transferring and concealing the Harrod Policy in violation of 18 U.S.C. § 2(b) and 18 U.S.C. § 152(7).

To convict Heavrin on Count One the government must present evidence from which a reasonable jury could find beyond a reasonable doubt that: (1) Heavrin transferred, willfully caused to be trans-

ferred, concealed, or willfully caused to be concealed property belonging to the estate of the debtor, TSR; (2) in transferring, willfully causing the transfer, concealing, or willfully causing the concealment of the policy Heavrin acted knowingly and fraudulently with the intent to defraud creditors or the bankruptcy court; and (3) Heavrin acted in contemplation of bankruptcy or with the intent to defeat the provisions of title 11. 18 U.S.C. § 2(b), 152(7); 1 COLLIER ON BANKRUPTCY § 7.02[7][a] (Lawrence P. King ed., 15th ed.2000).

### A.

■ Heavrin argues that the Harrod Policy was never property of TSR and, therefore, the government cannot prove a part of the first element, the transfer of property belonging to TSR. As explained in Section IV of this Memorandum, strong arguments support Heavrin's contention that the Collateral Assignment eviscerated any possible value of the policy to TSR. The Collateral Assignment gave MDFC an iron-clad right to the Harrod Policy proceeds so long as TSR's indebtedness exceeded the value of the policy. At all relevant times, TSR's indebtedness far exceeded the value of the policy. Nevertheless, TSR did retain, in essence, a possibility of reverter in any policy proceeds that exceeded MDFC's debt. Whether this potential interest had any actual value to TSR is a debatable legal question. In various contexts, courts have reached different conclusions concerning the legal ownership of insurance policies under

these circumstances. *Compare, Estate of Lellock v. Prudential Ins. Co.,* 811 F.2d 186, 190 (3rd Cir.1987) (fully assigned life insurance policy is not part of the bankruptcy estate); *In re Jones,* 908 F.2d 859, 861 (11th Cir.1990) (life insurance policy assigned as collateral found to be property of bankruptcy estate). Notwithstanding these conflicting legal authorities, the Court concludes that prior to June 1994, TSR did own the Harrod Policy.[4]

No one disputes that Heavrin had a hand in the transfer. At Heavrin's suggestion, on June 17, 1994, Macatee transferred ownership of the Harrod Policy from TSR to the Harrod Trust. Because this Court finds that TSR had a property interest in the Harrod Policy, a reasonable inference from the evidence suggests that Heavrin willfully caused a transfer of property belonging to TSR.

### B.

■ 18 U.S.C. § 152(7) only criminalizes fraudulent transfers made in contemplation of bankruptcy.[5] The government's theory is that Heavrin concealed the transfer from TSR's creditors and the Bankruptcy court, thus creating a fraud. To prove concealment is ordinarily not a difficult task. The government merely shows that either the debtor or the debtor's attorney failed to fulfill their statutory duty of disclosing those assets required by the bankruptcy petition. Upon such a

---

**4.** The substantiality or contingency of the policy's value do not alter TSR's ownership of the policy for proposes of the broad disclosure requirements of the bankruptcy code. *See United States v. Grant,* 971 F.2d 799, 809 n. 19 (1st Cir.1992). TSR did have a duty to disclose the transfer on its bankruptcy filings.

**5.** From TSR's poor business performance in 1993 and 1994, the numerous outstanding debts, and the Bell Atlantic judgment, a reasonable jury could conclude on June 17, 1994, Heavrin knew that bankruptcy was possible, if not probable.

showing, the reasonable inference as to intent follows naturally.

■ Ours is not such a simple case, however. Heavrin was neither the debtor nor its attorney in this bankruptcy proceeding. Chinn prepared and filed the petition for bankruptcy and Macatee signed the petition on the part of TSR. Because Heavrin was neither the debtor, the owner of the debtor, nor the attorney of record in the bankruptcy proceeding he had no specific affirmative duty, under the Bankruptcy Code, to disclose the Harrod Policy transfer on the petition. *Compare, e.g.* 11 U.S.C. § 521(1); *In re Coastal Plains, Inc.*, 179 F.3d 197, 207–08 (5th Cir.1999) (discussing *the debtor's* affirmative duty to disclose all assets). The government has cited *United States v. Ross*, 77 F.3d 1525, 1548 (7th Cir.1996), as supporting a broader reach of the bankruptcy fraud statute.[6] In short, the government seems to suggest that Heavrin should be legally responsible for a bankruptcy petition omissions as a *de facto* signatory to the petition.[7]

The Court has carefully considered this theory, its implications for bankruptcy fraud cases generally and its specific application to this case. The government proposes what amounts to a novel and expansive view of bankruptcy fraud liability. No other case supports such a broad reading of Section 152. Nor, in the Court's view, does the general and loose pronouncements in *Ross* expand legal responsibility to persons such as Heavrin, absent more specific proof of his part in the conceal-

ment. In fact, the Court could not find any reported case where a defendant was convicted of violating 18 U.S.C. § 152(1) who was anyone other than the bankrupt, the owner of a bankrupt corporation (*See e g. Ross*, 77 F.3d at 1533), or the attorney representing the corporation in bankruptcy, (*See e g. United States v. Center*, 853 F.2d 568, 569 (7th Cir.1988)). These facts simply do not sustain a legal theory making Heavrin criminally liable for an omission on the bankruptcy petition solely by virtue of his status as general counsel or corporate insider. *See Lanier v. U.S.*, 520 U.S. 1271, 117 S.Ct. 2447, 138 L.Ed.2d 206 (1997) ("... due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope").

Therefore, the government must prove Heavrin actually and affirmatively concealed the Harrod Policy transfer. The government seems to settle on two related theories to do so.

### 1.

■ The government's first theory is that the June transfer itself both concealed the proceeds and manifested the fraudulent intent necessary to violate the statute. Both concealment and intent can be implied by circumstantial evidence. An immediate problem is that the June transfer itself was not concealed from anyone. The transfer of the Harrod Policy was, by all accounts, legal and approved by all neces-

---

**6.** In *Ross*, the Seventh Circuit stated that 18 U.S.C. § 152 "Broadly criminalizes" bankruptcy fraud and, by its own terms, applies to "[w]hoever, either individually or as an agent or officer of any person or corporation... with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals... property belonging to the estate of the debtor [violates this section]." *Id.* at 1548.

**7.** The factual predicate for this theory is Heavrin's ubiquitous presence concerning everything connected to Chinn and TSR in this case: the proximity of Chinn's and Heavrin's offices, Chinn's prior business association with Heavrin and Heavrin's on-going legal representation of TSR.

sary parties.[8] The government did not argue that Heavrin deceived or misled Macatee. Macatee lawfully authorized the transfer on behalf of TSR. Harrod, Heavrin, TSR, MDFC, and Jackson National each knew of it.[9] In sum, the evidence, circumstantial or otherwise, is simply insufficient to allow a reasonable jury to conclude that Heavrin acted with the requisite fraudulent intent.

To be sure, the evidence shows that Heavrin had a motive to transfer the Harrod Policy because he benefitted by negotiating a settlement with MDFC. Considering the open and obvious nature of the transfer, however, the government must show more than motive to establish fraudulent intent. Criminal liability requires some affirmative act linking the Harrod Policy transfer to non-disclosure by third parties of the Harrod Policy on the bankruptcy petition. Under this evidence, the transfer alone is not a criminal act. The government seemed to concede this point and more strenuously argued its second theory.

2.

■ The government's primary theory is that transferring the Harrod Policy in June was part of Heavrin's plan ultimately calculated to deceive. Under this theory, if concealment took place, it occurred in the months after June.[10] The existence of such a plan could certainly establish criminal intent. To effectuate such an unlawful plan of concealment, however, Heavrin must somehow have caused the following acts: (1) David Chinn, as the attorney of record, to omit the Harrod Policy from the bankruptcy petition; (2) Macatee, the surviving principal of TSR, to fail to advise Chinn about the Harrod Policy transfer or settlement; and, (3) MDFC to fail to reduce its claim on TSR's estate by the full two million dollars it had a right to receive.

The government's theory faces a stunning and insurmountable roadblock: the government admits that it presented no evidence whatsoever to suggest, let alone prove, that Heavrin facilitated, encouraged, or caused Chinn, Macatee, MDFC or anyone else to conceal the Harrod Policy transfer on the bankruptcy petition. Had Heavrin a hand in influencing the actions of Chinn, Macatee or MDFC, evidence of it might be readily available from several sources. The government's case fails, however, due not just to the absence of incriminating evidence, but also due to the presence of other evidence.

Chinn had an independent duty to perform due diligence and examine TSR's books. There is no evidence that Heavrin hid records of the Harrod Policy or its transfer. The government did not call Chinn to testify, leaving one only to speculate why he did not disclose the transfer. Macatee knew of and had no objection to the transfer, the negotiations between Heavrin and MDFC, and MDFC's pay-

---

8. In an earlier adversary proceeding, the Trustee, Baxter Schilling, took the position that TSR transferred the Harrod Policy to the Harrod Trust (the same presumably would be true of the Macatee Policy transfer) without consideration. In post-trial motions regarding attorney's fees, the United States seems to make a similar suggestion. At best, this seems to be wishful thinking on the government's part. In the criminal case the government made no argument that the transfer itself was unlawful. They introduced absolutely no evidence that it was unlawful and advanced no legal theory supporting such a position.

9. The person and entity from whom the transfer was ultimately concealed, the bankrupt estate of TSR and its trustee, Baxter Schilling, had no legal existence at this time.

10. As a consequence, this theory closely follows the evidentiary trail required for Count Two. *See infra* Section IV.

ment to the Harrod Trust. He testified that in his view no legal transfer occurred in June because MDFC retained their absolute right to the Harrod Policy proceeds.[11] Finally, no evidence connects Heavrin to MDFC's non-disclosure of the full transaction.

■ In the criminal context, proximate causation requires a close relationship between the defendant's act and the crime. *See e.g., United States v. Spinney,* 795 F.2d 1410, 1415–16 (9th Cir.1986); Wayne R. Lafave & Austin W. Scott, Criminal Law § 3.12(c) (2d ed.1986). As explained here, the Trustee and the bankruptcy court were ignorant of the Harrod life insurance proceeds only because three entities with probable independent duties to report the transactions—Chinn, Macatee and MDFC—each failed to do so. Without a closer causal connection tying Heavrin's actions to the actions or omissions of any one of these three entities one cannot conclude that Heavrin caused a fraudulent or deceptive act.

What seems to exist here is a facially plausible theory without actual evidence from which jurors could find an unlawful scheme beyond a reasonable doubt. Far too many intervening decisions, actions, omissions, and obligations of third parties prevent the June transfer from causing or showing the intent to cause the September concealment. The concealment itself is far too indirectly related to the transfer to support a reasonable finding of willful causation or intent to conceal. Under any reasonable definition of "cause or bring about," this proof fails. Without evidence of willful intent or causation, no reasonable jury could find beyond a reasonable doubt that Heavrin acted fraudulently in transferring property belonging to TSR.

## IV.

■ Count One of the Indictment only charges Heavrin with fraudulent concealment of the June transfer. Count Two charges Heavrin with concealment of the November $252,000 settlement in violation of 18 U.S.C. § 152(1). To convict Heavrin on Count Two, the government must present evidence that Heavrin knowingly and fraudulently concealed or willfully caused to be concealed property belonging to the estate of the debtor, specifically the $252,000 received from Jackson National.[12]

---

11. At trial, the government appears not to have asked Macatee whether he talked with Heavrin or Chinn about disclosing either the policy transfer or the settlement. Macatee implies that he did not discuss the issue with Chinn (Trial Test. of Michael Macatee at 75). Other parts of the government's direct examination of Macatee at trial demonstrate its absolute failure to connect Heavrin to the concealment:

> Q. Who did you understand owned [the Harrod] policy, if you did, back in 1994?
> A. Well, I understood—well, I guess Triple S, but I understood the beneficiary to be McDonnell Douglas.
> Q. All right. Is that what you believed at the time?
> A. Yes.
> Q. Is that the reason why the transfer of the policy is not included in question 10 [of TSR's bankruptcy petition]?

> A. Yes.
> *Id.* at 48.

12. The underlying subtext of the government's case is that part of Heavrin's scheme involved threats or some other unlawful or unethical means to extract the $252,000 from MDFC. However, the government introduced no evidence that Heavrin's negotiations with MDFC involved unlawful or unethical arguments or tactics. What is clear is that MDFC retained an absolute right to the entire proceeds and thus had the strategic upper hand in any negotiations with Heavrin. Whatever payments made to Heavrin were made of MDFC's own free corporate will, not as a result of some unlawful threat or intimidation.

That Heavrin negotiated claims on behalf of his stepfather's trust at the same time he

Not surprisingly, the evidence as to Count Two is interrelated to that on Count One.

## A.

Whether the $252,000 insurance proceeds was property of the debtor is a disputed legal question.[13] The government asserts that the proceeds are property of the estate because MDFC settled with the Harrod Trust on the theory that Harrod's collateral was not proportionate to his liability.[14] Because TSR had an equitable interest in that settlement, the government argues, either the settlement or the potential claim should have been disclosed. *See, e.g., In re Coastal Plains,* 179 F.3d at 208 (requiring disclosure of all "contingent and unliquidated claims"); *United States v. Moynagh,* 566 F.2d 799, 803 (1st Cir.1977) (holding that defendant's failure to list equitable interest in boats that were legally owned by another company supported conviction for bankruptcy fraud). Under the government's argument, TSR had a claim to the $252,000 only if MDFC actually settled Heavrin's claim based upon the proportionality theory. For a host of sound reasons, this theory lacks both the legal support and evidentiary sufficiency to sustain criminal liability.

The Court recognizes the importance of disclosing all potential claims in civil bankruptcy proceedings. Irrespective of those civil obligations, the Court concludes that criminal liability should not be premised on the failure to disclose a claim which is itself frivolous. The overwhelming evidence discredits the proportionality theory as a potential or viable claim of TSR. Everyone agrees that MDFC had an absolute right to receive the full two million dollars of the Harrod Policy proceeds because TSR's debt always far exceeded two million dollars. Harrod's liability was joint and several with Macatee and TSR. In short, it is difficult to conceive that MDFC's rights in the Harrod insurance policy could be disproportionate. Finding no established legal basis for such a claim on the evidence of record, the Court must consider any TSR proportionality claim to have been frivolous.

Regardless, no jury could believe beyond reasonable doubt that the proportionality theory correctly explains MDFC's motive in releasing $252,000 of the insurance proceeds to the Harrod Trust. The evidence of MDFC's actual reasons for settling presents a muddled picture. True, Heavrin mentioned the proportionality theory on at least one occasion in correspondence with MDFC officials. MDFC officials mentioned it also. However, these references are extremely limited and entirely unconvincing in light of the entire transaction.[15] Heavrin did not negotiate

---

failed to negotiate on behalf of his client TSR raises an entirely separate and unanswered ethical question. However, all those who had reason to complain—Macatee and Harrod, individually and in their capacities as owners of TSR, MDFC, and Jackson National—knew of the situation and said nothing. The only evidence of record suggests that the concerned parties consented to this dual and conflict laden representation.

**13.** This is a different legal question than whether the Harrod Policy was property of TSR.

**14.** Under this theory MDFC settled with Heavrin because Harrod's two million dollar policy gave MDFC too much collateral relative to Harrod's fifty percent stake in TSR. MDFC took only $1.75 million in acquiescence to Heavrin's claim that it was over-collateralized. The government's argument suggests that had TSR, rather than the Harrod Trust owned the policy, TSR could have asserted this claim and reaped this reward.

**15.** That a proportionality claim by Harrod individually had almost no factual or legal basis also substantially discredits the theory as a reason for MDFC's payment.

the release of TSR's potential claims. It seems preposterous that MDFC would settle a proportionality claim that TSR could also assert, without securing a release from TSR. In truth, one can only speculate why MDFC settled with Heavrin.[16] The proportionality theory is the only explanation by which the $252,000 could be considered property of TSR's estate. Based upon this weak evidence, it seems quite untenable that Heavrin's criminal liability should depend on the label that a third party—MDFC—might choose to describe its payments to the Harrod Trust.

Even were the Court to assume that the $252,000 was property of TSR's bankruptcy estate, the government's case still would fail as a matter of law and for lack of proof. Heavrin had no affirmative duty to disclose the receipt or possession of the funds. All of the reasons which the Court discussed in Section III.B.2 of this Memorandum Opinion apply with equal force to the government's claim that Heavrin can be criminally liable for concealing the $252,000. With no duty to report this money, and no act of concealment, the evidence, as a matter of law, does not support the findings necessary for conviction on Count Two.[17]

### B.

If the government is correct, the allegations of concealing the Harrod Trust transfer and the $252,000 must necessarily be part of a single and broad fraudulent scheme which comprises both Counts One and Two of the Indictment. The Court

has looked at the evidence from many viewpoints to find a basis for criminality in all these circumstances. Heavrin's blindness to appearances and, perhaps, to ethical obligations causes considerable suspicion. To use a tired phrase, there is simply so much smoke, one expects to find a fire. Notwithstanding the Court's suspicions, every exploration of these facts and other hypothetical facts reinforces the finding of no willful causation and no criminality.

Suppose Heavrin did convince Macatee to transfer the Harrod Policy from TSR to the Harrod Trust to gain greater leverage for negotiating a settlement of Harrod's claims against MDFC. Suppose also that he knew TSR might go into bankruptcy and he then proceeded to negotiate a settlement of Harrod's claims which MDFC agreed to pay from insurance proceeds which were due and payable entirely to MDFC. From all this Heavrin profited $252,000, which could otherwise have gone to MDFC to reduce its secured claim against the TSR bankruptcy estate.

Even supposing that all this occurred with the consent and knowledge of the owners of TSR and MDFC, is this a crime or fraud? In these circumstances, the answer is no. Heavrin could not defraud TSR because TSR knew of his actions. Heavrin did not compromise or release any of TSR's claims. The creditor, MDFC, was certainly not defrauded. The Bankruptcy court or the Trustee could be de-

---

16. The record is at best unclear why MDFC settled. One reason for the confusion is that Heavrin talked to numerous MDFC officials. He may have used different arguments at differing times with different persons. Heavrin cared very little about the reasons; he only wanted the settlement. The MDFC officials may have had differing views of the seriousness of his various claims or differing

interests in characterizing the settlement. Though the lender liability claim makes the most sense, in the final analysis, one could only speculate as to the precise motives of the settling parties.

17. Since Count Eight relates to the proceeds of the money at issue in Count Two, it must fail as well.

frauded only if Heavrin subsequently had a hand in concealing the June transaction.

The Court has searched carefully for any action which Heavrin took or any duty which he willfully breached that lead to concealment of the transaction. The Court finds none. Heavrin had no independent legal duty to report the Policy transfer. That duty belonged to Chinn and Macatee. Heavrin had no duty to report his receipt of $252,000 from MDFC. Heavrin's "concealment" existed only because three entities with a possible legal obligation to report the transaction—MDFC, Chinn, and Macatee—did not do so. Without more specific evidence of concealment tied to Heavrin, these charges cannot be proven beyond a reasonable doubt.

## V.

■ Count Seven of the Indictment charges Heavrin with willful criminal contempt by disobeying a lawful order of the United States Bankruptcy Court in violation of 18 U.S.C. §§ 401(3) and 402. The statute's purpose is to punish disobedience of lawful court orders, to vindicate the authority of courts, and to protect the courts in the conduct of a business. *See, e.g., Young v. United States ex rel Vuitton et Fils S.A.,* 481 U.S. 787, 798–802, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). The need to protect the judicial process from willful impositions, particularly those designed to obstruct the normal machinery of justice, provides the foundation of the criminal contempt powers.

■ The crime of criminal contempt under 18 U.S.C. § 401(3) contains three essential elements: "(1) there must be a violation (2) of a clear and reasonably specific order of the court, and (3) the violation must have been willful." *United States v. NYNEX Corp.,* 8 F.3d 52, 54 (D.C.Cir.1993). The government must

prove that Heavrin has violated an order that is clear and unambiguous. *Id.* at 54–55 (citing *Armstrong v. Executive Office of the President,* 1 F.3d 1274, 1289 (D.C.Cir. 1993)).

The Bankruptcy court entered two virtually identical orders which are the subject of this charge. They state:

> IT IS HEREBY ORDERED that Defendants' motion to stay execution [of the judgment] is GRANTED subject to the following condition imposed on Defendants for the security of the Plaintiff: Except... to pay ordinary and necessary living expenses (and ordinary and necessary professional expenses relating to the practice of law by Donald M. Heavrin) of Donald M. Heavrin (herein "Heavrin"), ... Heavrin shall [not] sell, exchange, give-away, transfer or otherwise dispose of any assets (whether owned individually, jointly or in any other capacity by [Heavrin]) to any entity [as defined in 11 U.S.C. § 101(15)] for any reason, pending further Order of this Court.

The Indictment charges that Heavrin violated this order by "enter[ing] into an Asset Purchase Agreement, as Seller–Shareholder, for the sale of all the assets of the corporations then known as Total Vend, Inc. and Fat Albert's VIP Food Service, Inc., for a total purchase price of $1,105,000."

Heavrin has argued that the orders have expired and, therefore, he could not have violated them. After reviewing the procedural history and drawing every reasonable inference in favor of the government, the Court concludes that each of these orders was lawful and remained in effect at the time of the asset purchase agreement.

Heavrin's particular asset consisted of forty percent of the total shares of Total

Vend.[18] Total Vend itself owned various assets, such as consumables, vending machines, contracts, rights to receive future payments, goodwill, and various other items of value. Total Vend also had numerous liabilities, such as loans and accounts due. In September, 1999, Total Vend sold all its assets to International Vending Inc. As a matter of law, Heavrin did not sell any of these assets. Heavrin's asset remained the same—forty percent of the shares of Total Vend. Consequently, by its own clear terms, Heavrin did not violate the court order when Total Vend sold its assets by the asset purchase agreement.

This conclusion does not end the Court's inquiry. Once again, Heavrin appears to play fast and loose with his obligations to the bankruptcy court. This Court has an obligation, therefore, to determine whether the transaction's form hides the true substance. In other words, did Heavrin violate the spirit of the order by concealing the true nature of the transfer? The Court finds no evidence of such deception. To be sure, the Court cannot vouch for the validity of all the accounting and tax decisions made by Heavrin and Total Vend. The Court can envision any number of questionable areas.

The Court, however, must proceed from the evidence of record only and focus on how the evidence supports this count of the Indictment. No one disputes that Total Vend is a valid corporation. No one claims that Total Vend is the alter ego of Heavrin or that the asset purchase agreement was some sort of sham transaction. Heavrin did have considerable influence in Total Vend but there is no evidence that he could control the sale of the corporation's assets. No one denies that Total Vend's officers and board of directors fully authorized this sale. No one questions the valid business judgment of these officers and directors. Absent evidence to the contrary, one must assume an arm's length transaction. The Court concludes that under these circumstances the bankruptcy court order could not restrict Total Vend's asset sale agreement. In fact, the closer one examines the transaction, the less it appears to be one which violates the bankruptcy court's order.

True, the composition of Total Vend's assets did change. Prior to the sale it owned various kinds of personal property and owed substantial sums to many creditors. Afterwards, it owned cash and a note and had paid its secured creditors. Therefore, Total Vend did exchange its assets and, if imputed to Heavrin, this exchange would violate the bankruptcy court's order. However, Heavrin's specific asset—forty percent of the shares of Total Vend—remained unchanged and probably undiminished.[19]

Upon this close examination, the Court concludes that Heavrin did not violate the bankruptcy order by approving of Total Vend's asset purchase agreement.

**18.** At the time of the asset purchase agreement, the shares may have been held or owned about a revocable trust controlled by Heavrin. Regardless, the bankruptcy court order would control sale or disposal of the asset.

**19.** In all probability, the value of his shares may have increased because of the increased liquidity of Total Vend's assets. Initially, Heavrin received nothing from Total Vend's exchange of assets. Eventually, Total Vend repaid some of Heavrin's loans to the corporation. The repayment of those funds to Heavrin does not constitute disposal of assets by Heavrin; the repayment actually returned assets to Heavrin. Therefore, Heavrin's receipt of these funds could not violate the court order as a matter of law. The bankruptcy court order did prevent the disposal of these new assets. The government did not offer proof of what became of the repaid loans. Under these charges it is immaterial. The Indictment charged Heavrin only for his role in Total Vend's asset exchange.

## VI.

At the close of proof and after Heavrin's motion for acquittal, the government voluntarily moved to dismiss Count Nine of the Indictment. Heavrin was entitled to acquittal regardless.

■ Count Nine charged Heavrin with violating 18 U.S.C. § 152(2) by making a materially false statement under oath in relation to a bankruptcy proceeding. The Indictment alleges that Heavrin testified under oath that he had no ownership interest in Total Vend when, in fact, he had an individual ownership interest in Total Vend as a shareholder. To be sure, Heavrin's financial stake in Total Vend is not easy to understand. Heavrin made several payments to Total Vend. He describes some of those payments as loans and others as purchases of an equity interest. As the Court stated in Section V, it cannot vouch for the precise accounting of each payment. As to Count Nine, however, the Court's inability to do so is not important.

The important evidence is that Heavrin responded to a deposition question by Baxter Schilling, "And what percentage do you own of [Total Vend]?" saying, "I don't own any of it." (Heavrin Dep., Nov. 3, 1998, at 148). Heavrin went on to explain that he initially owned shares in Total Vend but subsequently transferred those shares to a trust fund set up for his sons. *Id.* at 149. At trial, Heavrin introduced Total Vend stock certificates supporting the truthfulness of his statement that when the deposition was taken on November 3, 1998, a revocable trust owned the shares. The government did not suggest that the documentation was false or fraudulent. It did not attempt to show that the trust was a sham or legal fiction. The only reasonable inference from Heavrin's testimony and the trust document is that Heavrin accurately described the ownership of the shares. Heavrin did not lie, deceive, or mislead in his answer. He told the truth.

He must, therefore, be acquitted of Count Nine.

## VII.

■ Counts Three, Four, Five, Six, Ten, Eleven, Twelve, Thirteen, and Fourteen of the Indictment charge Heavrin with money laundering. Since a prerequisite of money laundering is that the money must derive from "specified unlawful activity," Heavrin must be acquitted of these counts because he has been acquitted of all other counts. 18 U.S.C. § 1957.

This decision is based upon careful consideration of the evidence and the criminal charges. The result is not a consequence of some technicality or procedural mistake. On the other hand, it is not meant to bless all of Heavrin's conduct concerning TSR and Total Vend. The Court has broadly considered the mandate of substantive justice and believes that dismissal of these charges achieves that worthy objective.

The Court sustained Heavrin's motion for judgment of acquittal. This indictment and all the claims against him were dismissed by appropriate orders of acquittal.