NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0634n.06
Filed: August 29, 2007

05-5918

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| OMAR ABDI JAMAL, | ) | WESTERN DISTRICT OF |
| | ) | TENNESSEE AT MEMPHIS |
| Defendant-Appellant. | ) | |

Before: MOORE and COOK, Circuit Judges, and ADAMS,[*] District Judge.

**PER CURIAM.** Omar Abdi Jamal appeals from his conviction in the district court on three counts of making a false statement with respect to material facts in an application for immigration in violation of 18 U.S.C. § 1546, and two counts of making a false statement in violation of 18 U.S.C. § 1001. Jamal raises nine assignments of error. Because we find no error in the district court proceedings, we affirm the actions of the district court.

PROCEDURAL HISTORY

The charges against Jamal arose in 2001 when the Immigration and Naturalization Service (now the the Bureau of Immigration and Customs Enforcement) became aware of Jamal's immigration history and his residency status, which conflicted with the answers he

---

[*]The Hon. John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

1

gave on his application for asylum in the United States. It undertook an investigation and prosecuted the case.

At the time the indictment in this case was filed, Jamal lived in St. Paul, Minnesota, where he had founded and was operating a non-profit organization that assisted Somalians in the St. Paul area. Jamal filed a motion for a change of venue from the Western District of Tennessee to the District of Minnesota, citing the hardships of bringing witnesses and exhibits to Tennessee. The district court denied that motion.

Jamal then filed two separate motions for bills of particulars. In the first, filed January 23, 2004, he requested a bill of particulars as to Counts 4, 5 and 6.[1] Because the government failed to oppose that motion, the court granted it. The government then filed a motion to reconsider the granting of Jamal's motion on Counts 4,5 and 6, which the district court granted, denying Jamal's request for a bill of particulars on Counts 4, 5 and 6. On February 9, 2004, Jamal filed a second motion for a bill of particulars with respect to Counts 1, 2 and 3. The government never opposed the motion, which the district court granted. Jamal later filed a motion to dismiss Counts 1, 2 and 3 for lack of proper venue, which the district court denied. The jury trial in this case lasted from January 3 to January 7, 2005. Jamal did not testify.

Jamal moved for judgment of acquittal at the close of the government's case and again at the end of the trial, both of which were denied. He then filed a written motion for judgment of acquittal, a motion for a new trial, and a motion for leave to complete the

---

[1] The government dismissed Count 6 prior to trial.

record with newly discovered evidence. The district court granted his motion to complete the record and denied his motions for acquittal and for a new trial. On June 2, 2006, Jamal was sentenced to one year of probation, and was referred to the United States Citizenship and Immigration Service for deportation.

FACTUAL BACKGROUND

On November 10, 1989, Omar Abdi Jamal (a.k.a. Jamal Abdi Omar), a Somali citizen, arrived in Canada and applied for refugee status. In that application, he said that he was a member of the Majeerten clan, one of two dominant clans in Somalia, and that he was unmarried and childless. The only date provided for his date of birth was February 1969. He received landed immigrant status on December 2, 1991. He was last seen in Canada in 1992.

On October 20, 1997, Jamal arrived at New York's JFK International Airport from Kenya, carrying a false Kenyan passport. In April 1998, he sought asylum in the United States from his home country of Somalia. On his application for asylum, he indicated that he was a member of the Midgan tribe, a minority tribe facing persecution in Somalia and Kenya. He gave his date of birth as February 1, 1973. He also said that he had married in 1990 in Mogadishu, and that he had a child who was born in December 1992 but who passed away in early 1993. He gave a post office box in Memphis, Tennessee, for return mail, and provided a street address in Memphis at other points in the application.

Jamal answered the following three questions on his application for asylum in the negative, by checking the "no" box:

3

1.   Do you or your spouse or child(ren) now hold, or have you ever held, permanent residence, or other permanent status or citizenship, in any country other than the one from which you are now claiming asylum?

3.   Have you or your spouse or child(ren) otherwise ever filed for, been processed for, or been granted or denied refugee status or asylum by any other country?  If YES, your answer should include an explanation of the decision and what happened to any status conveyed as a result.

4.   After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the U.S., travel through or reside in any other country before entering the U.S.?  If YES, your answer should, by person, identify each country, the length of stay, status while there, the reasons for leaving, whether the person is entitled to return for residence purposes and, if the person did not apply for refugee status or for asylum while there, why he or she did not do so.

Contrary to the answer Jamal provided to Question 1, he had attained "landed immigrant" status in Canada in 1991.  "Landed" status is Canada's equivalent of "permanent" status in the United States, and the terms are used interchangeably in Canada.  Prior to receiving landed immigrant status, an immigrant to Canada must apply for refugee status, which Jamal did on November 10, 1989.  This conflicts with Jamal's answer to question number 3.  Finally, although Jamal answered question number 4 in the negative, which would mean that he had not traveled through or resided in a country other than Somalia before coming to the U.S., further down on the same page he provided an address in Kenya as his address for the past five years.  Jamal signed the section of the application certifying the veracity of his answers and acknowledging the penalty for false answers. For each of the three answers above, the government charged Jamal with one count of making a false statement under oath in violation of 18 U.S.C. § 1546.

When Agent Suzette Uthman interviewed Jamal on June 11, 1998, as the next step

4

in his application for asylum, she reviewed with him his application for asylum to ensure his credibility and the consistency of his responses. She placed Jamal under oath as part of the interview process. Although Jamal had indicated on his application that he was fluent in English, he brought Bashir Jama, a fellow Somali with whom Jamal was sharing an apartment in Memphis, to act as an interpreter in the interview. According to her regular practice, Agent Uthman placed Mr. Jama under oath as the interpreter. She said that she did not notice any suspicious behavior during the interview, nor did she find that Mr. Jama acted poorly as the interpreter. She concluded that Jamal was credible, and he was granted asylum status on August 21, 1998. Based on his answers in this interview, Jamal was ultimately prosecuted on two counts of making a false statement to an officer of the United States under 18 U.S.C. § 1001.

## ANALYSIS

1.    Sufficiency of the Evidence

Jamal first challenges the sufficiency of the evidence on all counts, though he has challenged the counts relating to the written application separately from those relating to the interview. Because we find that the evidence was sufficient on all counts, we will address them together.

A conviction withstands a sufficiency of evidence challenge if, "after viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in the government's favor, the evidence is sufficient to justify a reasonable juror's conclusion that each element of the offense has been established beyond a

reasonable doubt." *United States v. Poulos*, 895 F.2d 1113, 1117 (6th Cir. 1990) (internal citations omitted), citing *Jackson v. Virginia*, 443 U.S. 307 (1979). "A defendant claiming insufficiency of the evidence bears a very heavy burden. On review, all evidence must be construed in a manner most favorable to the government. Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Abner*, 35 F.3d 251, 253 (6th Cir. 1994) (citations omitted).

In order for the government to prove a violation of 18 U.S.C. § 1546, it must prove that "(1) the defendant made a false statement under penalty of perjury with respect to a material fact; (2) the statement was made in an application, affidavit, or other document required by the immigration laws or regulations; and (3) the defendant made the statement knowing that it was false." *United States v. Kone*, 307 F.3d 430, 434 (6th Cir. 2002). Similarly, to support a conviction under 18 U.S.C. § 1001, the government must prove the following: (1) the defendant made a statement; (2) the statement was false; (3) the defendant had knowledge of the falsity of such statement; (4) the statement was relevant to the functioning of a federal department or agency; and (5) the false statement was material. *See United States v. Hixon*, 987 F.2d 1261, 1266 (6th Cir. 1993).

The jury heard testimony that Jamal had received both refugee status and permanent or landed immigrant status in Canada. Jamal took his GED exam in the United States, which was administered entirely in English. His highest score was on the language arts portion (writing), and he scored above average on his reading skills. He then went to

the local university and took classes as a full-time student, all of which were taught in English. Jamal told the INS in his written application, on which he indicated that he was fluent in English, that he had never applied for or attained refugee or permanent status in any other country. He did not tell Agent Uthman during the interview that he had not understood the questions or that he wanted to amend his answers.

The jury also heard evidence about the differences between Jamal's Canadian residency applications and his United States asylum application. In Canada, he had claimed to be a member of the Majeerten tribe, which at least one witness testified was a majority tribe. In his application in the United States, he claimed to be a member of the minority, persecuted Midgan tribe. In Canada his paperwork reflected an incomplete birth date of February 1969; his United States application showed a birth date of February 1, 1973.

There was a notable inconsistency between when Jamal said he suffered persecution in Somalia and when a defense witness, Said Dirie, had seen Jamal in Canada. Jamal's asylum application indicated that he had been persecuted in Mogadishu in 1991, after which he fled Somalia for Kenya. Mr. Dirie testified that Jamal had come to Canada in 1987, and that he had last seen Jamal in Canada in 1992, though he could not recall the exact date.

Agent Uthman testified about how it would affect a person's application for asylum in the United States if that person had already achieved permanent residence in another western country. Because the purpose of asylum in the United States is to protect targeted

individuals from oppression or persecution in their country of origin, a person who has achieved that protection in Canada is ineligible for asylum in the United States because Canada's refugee protections are similar to those in the United States. Agent Uthman said that, had Jamal answered "yes" to the questions about whether he had sought refugee or asylum status in another country, it would have been a "mandatory bar" to asylum in the United States.

Jamal argues that this information was not sufficient to establish that he knowingly and intentionally made false statements, and counters that the government failed to prove that he was not simply confused by the questions because English was not his native language. The focus of his argument is that the answers to questions 1 and 3 were "factually correct." With respect to the first question, he claims that the status he ultimately achieved in Canada was called "landed immigrant" status, not "permanent," and that such status was not actually permanent because it could be lost if a person left the country for longer than six months in a one-year period. As to the third question, he argues that Canada did not refer to its intermediate status as "refugee status." Therefore, he argues, the questions were fundamentally ambiguous.

In support of this argument, he cites *United States v. Diogo*, 320 F.2d 898 (2d Cir. 1963), and two of the cases in the Sixth Circuit adopting *Diogo*, namely *United States v. Gahagan*, 881 F.2d 1380 (6th Cir. 1989), and *United States v. Gatewood*, 173 F.3d 983 (6th Cir. 1999). As part of this argument, he contends that he should be permitted to raise the "fundamental ambiguity" defense to perjury charges, which was recognized in *Diogo*.

*Diogo*, 320 F.2d at 907. A fundamental ambiguity "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *United States v. Lattimore*, 127 F. Supp. 405, 410 (D.D.C. 1955) (finding that the phrase "follower of the Communist line" was ambiguous).

The defendants in *Diogo* were convicted of making false representations to immigration authorities regarding their marital status. *Diogo*, 320 F.2d at 900. The government contended that the defendants had entered into sham marriages in order to achieve citizenship in the United States. *Id.* The defendants argued that they had legitimately married under state law, and had therefore correctly represented that they were married. *Id.* at 903. The issue was whether a person who had met the legal requirements under the state's marriage laws, but who may have done so without the intent to remain bound to the marriage, could legitimately claim to be married. The circuit court observed that a court is not compelled to accept as conclusive a defendant's explanation of his understanding of the words at issue. *Id.* at 907. However, it held that the government must present some evidence of a defendant's state of mind when a defendant is charged with making false representations, the truth of which representations may hinge upon the defendant's understanding of a word. *Id*. Where "no evidence is presented on the question, it is incumbent upon the Government to negative any reasonable interpretation that would make the defendant's statement factually correct." *Id.*

*Gahagan* and *Gatewood* dealt with similar questions. The defendant in *Gahagan*

had allegedly represented in a financial report submitted to his probation officer that he did not own a Jaguar whose title he had transferred to his girlfriend shortly before he submitted the report. *Gahagan*, 881 F.2d at 1381. The government contended that he had merely transferred title to avoid reporting ownership of the car, which he still owned for all practical purposes. *Id.* at 1383. The question considered by the court was whether Gahagan truly owned the car, and whether his representations on the financial report were correct under his interpretation. *Id.* at 1382. Applying *Diogo*, the court held that the government should have negated the interpretation of "ownership" that could make Gahagan's representations factually correct, because the question of legal ownership of the car was ambiguous. *Id.* at 1383-84.

Similarly, the defendant in *Gatewood*, a construction contractor hired by the United States Navy, represented that "payments to subcontractors and suppliers [had] been made from previous payments received under the contract." *Gatewood*, 173 F.3d at 984-85. The Navy learned that, in fact, he had paid only some subcontractors, and had paid them only a portion of their total invoices. *Id.* Applying *Gahagan*, the court found that "it [was] incumbent upon the Government to negative any reasonable interpretation" that would make Gatewood's representation factually correct. *Id.* at 986-87, quoting *Gahagan*, 881 F.2d at 1383.

The *Diogo* case and its progeny are inapposite in this context. The *Diogo* defendants were charged with misrepresenting their marital status on the grounds that they had entered those marital relationships with a fraudulent intent. The legal status that

formed the basis of their representations was called into question. The Second Circuit ruled that if the government could not provide proof of the defendants' subjective intent to enter the sham marriages and then knowingly misrepresent their marital status, it would have to negate any understanding of the word "marriage" that could make the defendants' representations factually correct. *Diogo*, 320 F.2d at 907. The same is true of the defendants in *Gahagan* and *Gatewood*: the concepts of ownership and payment were at issue, requiring the government to negate the defendants' interpretations of those concepts. *Gahagan*, 881 F.2d at 1383-84; *Gatewood*, 173 F.3d at 986-87.

In this case, Jamal's subjective intent to achieve or avoid the underlying legal status referenced in questions 1 and 3 of the asylum application was immaterial. In fact, he had achieved refugee status, and he had later achieved landed immigrant status, which is Canada's version of permanent residence. Contrary to Jamal's assertions, no interpretation could make his answer "factually correct" as provided in *Diogo*. Therefore, the government was under no obligation to negate any purported "factually correct" interpretations of his answers. For the same reasons, the "fundamental ambiguity" defense is also inapplicable to Jamal's case, as the questions in the asylum application asked about common terms such as "refugee" status and "permanent" residence, both of which he had in fact applied for and achieved.[2]

Even if this court were to decide that *Diogo* applies, the government provided

---

[2]As the district court aptly noted, Jamal at once alleges that he lacked sufficient knowledge of English to understand this application form (any evidence to the contrary notwithstanding), and interprets the questions with a careful consideration of semantic subtleties and definitional nuances. The contemporaneous truth of both accounts is at least unlikely.

evidence at trial that rendered Jamal's purported understanding of the questions objectively incorrect, making it unlikely that this was actually Jamal's understanding. The government called two witnesses from Canada: a Canadian immigration officer, and Jamal's lawyer in Canada who had helped with Jamal's application for landed immigrant status. Both testified that the terms "landed immigrant" and "permanent resident" are routinely used interchangeably. The immigration officer further testified that Jamal attained refugee status—called "convention *refugee*" status—before becoming a landed immigrant, negating Jamal's argument about question 3. Moreover, the immigration officer testified that landed immigrant status is considered permanent because, if a landed immigrant chooses to leave the country for more than half the year, the government must show that he or she actually pulled up his roots and entirely relocated to another country in order to revoke his or her permanent status.

Jamal further contends that his answer to question 4, which was Count 3 in the indictment, indicated confusion rather than deception. Question 4 asked whether he had traveled to a country other than his country of origin before coming to the United States. Jamal notes that, while he answered no, that answer was contradicted further down the page on his application, where he gave an address in Kenya at which he said he had lived from 1991 to 1997. The jury heard testimony on that point that called Jamal's explanation into question. Mr. Dirie testified that Jamal had been living in Canada from 1987 to 1992. Agent Uthman testified that Jamal told her that he suffered persecution in Mogadishu in 1991. The application for asylum in the United States indicated that he had married in

Mogadishu in 1991, and his wife had given birth to a child at the end of 1992, during the same period of time when Canadian records reflected that he had received permanent residence status and Mr. Dirie had last seen Jamal in Canada. Agent Uthman also testified that Jamal had given several addresses in Kenya from 1991 to 1997, but only one appeared on the application form. Although Jamal contends that Agent Uthman admitted that the answer was probably a mistake, the jury was free to conclude otherwise based on all of the other evidence it heard.

Given all of the testimony, a reasonable juror could have found, beyond a reasonable doubt, that Jamal had intentionally provided false answers to questions 1 and 3 on his asylum application, and had perpetuated those answers in his asylum interview. Therefore, the evidence was sufficient to support the jury's verdict on counts 1, 2, 4 and 5. The government did not provide evidence of where Jamal actually lived from 1992 to 1997, but the jury heard ample evidence that conflicted with the answers Jamal had provided on his application for asylum. It also heard that, had Jamal answered "yes" to these questions, he would not have qualified for asylum in the United States. Based on all of the evidence, including the evidence adduced in support of Counts 1, 2, 4 and 5, a reasonable juror could have inferred that Jamal had intentionally falsified his answer to question 4 (Count 3), regardless of the inconsistency on the same page of his application. The court affirms the district court's decision that the evidence at trial was sufficient to support a verdict of guilt on all counts.

2.      *Brady* and Jencks Act Challenges

Jamal next alleges that the government withheld exculpatory information from him in violation of the principles set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500. As he fails to make any sort of argument regarding an alleged violation of *Giglio*, which case he merely mentions in passing, and as both his *Brady* and Jencks claims must fail, it is unnecessary to address *Giglio*.

The Supreme Court held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Court later set forth expressly the three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280.

The Jencks Act "requires the prosecution to supply the defense with any material statement made by a witness to the government that is signed or otherwise verified by the declarant." *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002). Review of violations of the Jencks Act is subject to a harmless error analysis. *United States v. Susskind*, 4 F.3d 1400, 1406 (6th Cir. 1993).

14

Jamal identifies two documents that he alleges constitute violations of *Brady* and the Jencks Act. The first, marked as Exhibit 29 at trial, was a computer printout generated by the immigration authorities in the United States. It recorded the arrival in the United States on October 7, 1997, of a man named Jamal Abdi Omar[3], whose date of birth was February 1, 1969, and who entered in Toronto. Jamal claims that this form does not apply to him based upon testimony offered by Agent Uthman, and that the prosecution's use of the form without informing Jamal that it did not apply to him was a violation of *Brady*.

During the trial, Agent Uthman explained that this form was generated when Jamal came to the United States. Jamal was processed by an agent in Canada before he boarded the plane to the United States, hence the identification of Toronto as the port of entry. At that time, he indicated that his intended destination in the United States was an address in Minnesota, and that he was a non-immigrant visitor for pleasure. The date of birth he gave was the same date of birth he had given on his immigration papers in Canada. Although Agent Uthman looked for Jamal's immigration history in the computer system before she interviewed him, she did not find this record because it was filed under the name "Jamal Abdi Omar," rather than "Omar Abdi Jamal."

One of the first entries on this printout was the number of the passport on which Jamal was traveling. Agent Uthman testified at first that she did not know whether the passport number indicated a Canadian passport. She then went on to say, "[T]he country of citizenship is Somali[a], so it would be a Somali passport. Otherwise country – Unless

---

[3]Mr. Jama testified at trial that Jamal used the names "Omar Abdi Jamal" and "Jamal Abdi Omar."

the person was a dual national, I guess, and just happened to present the Somali passport." (J.A. 1003). Jamal has seized upon this testimony as proof positive that the government withheld from the defense the fact that the passport code on the intake form referred to a Somali passport. Because Jamal did not present a Somali passport upon entry in the United States, the defense has concluded that the form did not apply to him and that it was presented simply to mislead the jury and to suggest that Jamal's defense was not credible.

However, Agent Uthman had testified earlier that Jamal had entered the United States on an imposter Kenyan passport. She later qualified her testimony about the passport number on Exhibit 29 by saying that she believed that it referenced a Somali passport, which she determined not by the passport number but by the stated country of citizenship. During the government's re-direct examination, Agent Uthman further qualified her testimony: "I wasn't there, but I'm just saying, I used to be an inspector, and if everybody did their job as they should have, it would have been a Somali document." (J.A. 1007).

This testimony does not amount to proof that the number was a code for a Somali passport. At no point could Agent Uthman positively testify that the passport was Somali based upon the passport number. Even assuming that Jamal is correct in his argument, and the government had told Jamal that the passport number referred to a Somali passport, it is not clear that the information would have changed the outcome of the trial. Jamal represented to Agent Uthman that he had arrived using a Kenyan passport, but no

16

one could produce the passport he had used. The jury could have considered this evidence in weighing the testimony of the government's witnesses against the representations of the defense.

In addition, the government provided Exhibit 29 to the defense prior to trial as part of its discovery. If the defense hoped to learn what the codes meant, it could have made an attempt to do so prior to trial, as it had all of the information contained in the document at its disposal. There was no violation of *Brady* with respect to Exhibit 29. Jamal cannot demonstrate that the information on Exhibit 29 was favorable to his defense, or that he was prejudiced at trial by the lack of this piece of information, whose relevance was arguable. Even if he could, the government properly disclosed Exhibit 29 prior to trial, and was not charged with the duty of instructing Jamal as to its content. Furthermore, this document does not fall within the purview of the Jencks Act because it is not a statement made and adopted by a witness for the government. *See* 18 U.S.C.S. § 3500(e).

Jamal next identifies a customs immigration report with which the district court permitted him to supplement the record after the trial, and which he claims proves that the government undertook the prosecution of this case in bad faith and solely because Jamal advocated for the Somali community in Minnesota. This document states as follows, "This case originally came to the attention of the INS in Minneapolis, Minnesota during a Hawala[4] investigation. The information indicated that SUBJECT was a Refugee in Canada prior to applying for asylum in the United States." (J.A. 381). It is signed by Agent Petrie, the

---

[4] Hawala is a Somali wire transfer company used to wire funds to Somalia.

immigration officer who investigated Jamal's case.  Jamal's counsel found this document after the trial with papers that he had removed from the defense table, and that he believed were put there while Agent Petrie testified for the government.  He argues that the above-quoted statement contradicts the government's representations that it had not prosecuted Jamal because of his ties to the Somali Muslim community in Minnesota or his outspokenness in its defense.

As the district court properly found, this document demonstrates no such thing.  It is unclear how defense counsel gained possession of this document and whether it was part of the file to which defense counsel had access during discovery.  However, the contents of the document are immaterial to Jamal's defense, and Jamal has suffered no prejudice from allegedly not having the letter during trial.  Jamal contended in the trial that immigration authorities had decided to prosecute his case before they received calls informing them of Jamal's Canadian immigration status, implying that the government had targeted him for prosecution because of his involvement in the Somali community in Minnesota.  Defense counsel made that point during the cross-examination of Agent Petrie by demonstrating that the investigation had begun as early as October 31, 2001, while calls were not received until April 1, 2002.

The document Jamal now references has the additional information that Jamal came to the government's attention through Hawala investigations, but it is unclear how this furthers Jamal's case.  The reasons for the government's investigation are immaterial: there is no challenge that the investigation itself infringed upon any of Jamal's

18

constitutional rights. For the reasons set forth above, we find that neither document identified by Jamal constitutes a *Brady* or Jencks Act violation.

3. Venue Challenges

Jamal next challenges the district court's finding that the prosecution both brought this action in the proper venue, and provided sufficient evidence for the jury to find that venue had been proven. He argues that the government failed to prove that the events charged in Counts 1 through 3 took place in Tennessee, the venue in which the charges were prosecuted. In his argument on this issue, Jamal contends that Houston, Texas, was the only proper venue for prosecution of Counts 1 through 3. First, according to Jamal, the government did not prove that he had actually filled out the asylum application in Tennessee, calling into question the propriety of Tennessee as the venue for prosecution. Secondly, the immigration office to which he mailed the asylum application was located in Houston, Texas, and, if the information on the application was false, this was where Jamal had presented and the government had received any false information.

This Circuit has long recognized that the government must prove venue only by a preponderance of the evidence. *United States v. Grenoble*, 413 F.3d 569, 572 (6th Cir. 2005); *United States v. Zidell,* 323 F.3d 412, 421 (6th Cir. 2003); *United States v. Thomas*, 74 F.3d 701, 709 (6th Cir.), *cert. denied*, 519 U.S. 820 (1996); *United States v. Beddow*, 957 F.2d 1330, 1335 (6th Cir. 1992); *United States v. Charlton*, 372 F.2d 663, 665 (6th

19

U.S. v. Jamal
No. 05-5918

Cir.), *cert. denied*, 387 U.S. 936 (1967).[5]  Venue may be inferred from circumstantial

evidence.  *See, e.g., United States v. Canino*, 949 F.2d 928, 942 (7th Cir. 1991).

"Unless a statute or these rules permit otherwise, the government must prosecute

an offense in a district where the offense was committed."  Fed. R. Crim. P. 18.  The site

of the commission of the crime charged

must be determined from the nature of the crime alleged and the location of the act or acts constituting it.' [*United States v. Cabrales*, 524 U.S. 1, 6-7 (1998) (internal citations omitted)].  In determining the 'locus delecti' of a crime, the Supreme Court directs us to 'initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts.'  *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 [ ] (1999).  Venue is therefore appropriate only in the district where the conduct comprising the essential elements of the offense occurred.

*United States v. Wood*, 364 F.3d 704, 710 (6th Cir. 2004).

Under 18 U.S.C. § 1546(a), a person commits visa or passport fraud who

knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact.

18 U.S.C. § 1546(a).

Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, transportation in interstate or foreign

---

[5] The preponderance of the evidence standard for proving venue is also reflected in the Sixth Circuit's Pattern Criminal Jury Instructions, 3.07, which includes the following sentence: "Unlike all the other elements that I have described, this is just a fact that the government only has to prove by a preponderance of the evidence."

commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

18 U.S.C. § 3237(a).  See *Beddow*, 957 F.2d at 1335.[6]

The statute governing Counts 1 through 3 of the indictment provides that either the making of the false statement or the presentation of that statement constitutes passport or visa fraud.  Therefore, if Jamal filled out his application in Tennessee, venue is proper in Tennessee.  The prosecution presented evidence that Jamal took the GED in Memphis, Tennessee, on January 14, 1998, providing as his address the Holly Hedge apartment in Memphis that he shared with Mr. Jama.  Further, Jamal applied to take classes at Memphis State University on January 15, 1998, providing the same Holly Hedge apartment address. The asylum application itself, dated April 1, 1998, provided two Memphis addresses:  the Holly Hedge apartment address, as well as a post office box to which communications from the INS were sent, according to Agent Uthman.  The evidence presented by the government was sufficient to permit the jury to infer that Jamal had completed his application in Tennessee, and that venue was therefore proper in Tennessee. We affirm

---

[6]*Beddow* provides that 18 U.S.C. § 3237 generally applies to crimes committed in more than one district for which the applicable statute does not prescribe a venue.  The Supreme Court held in *United States v. Cabrales*, 524 U.S. 1 (1998), that *Beddow*, and therefore 18 U.S.C. § 3237, did not permit prosecution for anterior criminal conduct in one district that created the opportunity to commit a crime in another (in that case, amassing funds in one district with which to commit money laundering in another). According to the Court, when the statute governing the actual criminal conduct only addressed the conduct itself, rather than anterior criminal conduct that created the funds later laundered, the situs of the crime was where the actual criminal conduct occurred.  In this case, the statute at issue, 18 U.S.C. § 1546, directly addresses making a false statement in addition to presenting that statement to immigration authorities.  Therefore, the reasoning in *Beddow* regarding proof of venue applies to this case, as does 18 U.S.C. § 3237.

the district court's denial of Jamal's venue challenges.

4.      Jury Instructions

Jamal next challenges the district court's refusal to give his proposed jury instruction regarding state of mind, as set forth in *Diogo*, *supra*.  A circuit court reviews a district court's denial of a proposed jury instruction for an abuse of discretion.  *United States v. Frost*, 914 F.2d 756, 766 (6th Cir. 1990).  "A district court's refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense."  *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991).

Neither the Joint Appendix nor the record presented to this court includes Jamal's proposed instruction.  In the trial transcript, the parties argued orally their proposed jury instructions without proffering them in their entirety.  Jamal has not provided the language of his proposed instruction in his brief to this court.  The appellant bears the burden of presenting the appellate court with the portions of the record necessary to determine his appeal, and of supplementing the record with any information not contained therein.  *See* Fed. R. App. P. 10, Fed. R. App. P. 30.  Without the text of Jamal's proposed instruction, this court cannot determine whether that instruction was a correct statement of the law or whether it was substantially covered by the charge the district court delivered to the jury.

Even if this court were to assume that Jamal presented the *Diogo* state of mind instruction accurately, *Diogo* does not apply to the facts of this case, as discussed above.

"Regardless [] whether a proposed instruction correctly states a legal abstraction, when the instruction is not applicable to the facts, it is properly denied." *Saglimbene v. Venture Indus. Corp.*, 895 F.2d 1414 (6th Cir. 1990) (unpublished table decision), (quoting *Hobson v. Wilson*, 737 F.2d 1, 41 (D.C. Cir. 1984)). For the foregoing reasons, we find that Jamal's challenge of the district court's jury instructions is without merit.

5.      Bill of Particulars

Among his pretrial motions, Jamal moved for bills of particulars on Counts 1 through 3 and Counts 4 through 6. The district court ultimately denied the motion on Counts 4 through 6, and granted the motion on Counts 1 through 3. However, in Jamal's appellate brief, he discusses an appeal from the denial of *both* motions. The docket from the trial court clearly reflects that the motion was granted on Counts 1 through 3. Jamal's assertion that the district court denied his motion for a bill of particulars on Counts 1 through 3 is in error, and the attendant argument is extraneous. It is only necessary to proceed with a review of the trial court's denial of Jamal's motion on Counts 4 through 6.

In challenging the district court's denial of a motion for a bill of particulars, a defendant "must show not only that the court abused its discretion, but that [he] actually suffered surprise or other prejudice at trial." *United States v. Crayton*, 357 F.3d 560, 568 (6th Cir. 2004) (internal quotation omitted). "An abuse of discretion exists only when the reviewing court is firmly convinced that a mistake has been made." *United States v. Salisbury*, 983 F.2d 1369, 1375 (6th Cir. 1993).

Jamal incorrectly argues that the governing case at trial was *Gahagan*, *supra*, in

23

which this court adopted the Second Circuit's holding in *Diogo, supra*. While it is true that the government had to prove that Jamal knowingly and intentionally misrepresented facts in his asylum application, neither *Diogo* nor *Gahagan* is controlling in this case, as discussed above in our review of Jamal's sufficiency claim. The application of *Diogo* and its progeny is limited to those situations in which the legal status or actions about which a defendant is making statements is in question. That is not the case here.

Counts 4, 5 of the indictment specified the questions to which Jamal had allegedly provided false answers. The indictment on Count 4 read that he knowingly "did state and represent, and cause[] to be stated and represented, that he had never held, [sic] permanent residence, or other permanent status or citizenship, in any other country other than the one from which he was then claiming asylum. Similarly Count 5 read that he knowingly "did state and represent and cause[] to be stated and represented that he had never filed for, been processed for, or been granted or denied refugee status or asylum by any other country." There is no evidence that Jamal was prejudiced at trial by a lack of information regarding the charges against him in Counts 4 and 5. We affirm the district court's decision to deny the motion for a bill of particulars for Counts 4 and 5.

6. Conduct of District Court During Jury Deliberations

Jamal assigns error to the judge's absence during the final day of jury deliberations. The jury received this case to begin its deliberations on January 6, 2005. After almost three hours of deliberations, the district court received a note from the jury that it was "at a standstill." The district court called the jury into the courtroom and learned that the jury

24

felt it should retire for the day and come back the next day to resume deliberations. The foreperson told the court that the jury room was too hot. The judge then informed the jury that he had to be away the next day for a conference, but that another judge would be available to take his place. After the jury had left, defense counsel expressed concern about the judge's availability to answer any questions the jury might ask. The court told counsel that he would be available by phone should questions arise, and another judge would be available to take the jury's verdict. Defense counsel responded, "All right, all right." At no point did he object to the district court's arrangements.

Jamal represents that the next day, the jury returned a verdict of guilty on all counts after thirty minutes of deliberations. A different judge received the verdict and polled the jurors, each of whom attested that this was his or her verdict. When the court asked whether there was anything further on behalf of the defendant, defense counsel said there was not. Again, he did not object to the proceedings. For that reason, any objection to this issue is now forfeited, and the district court's actions are subject to review for plain error. *United States v. Olano*, 507 U.S. 725, 732-33 (1993). Under the plain error test, "before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *Olano*, 507 U.S. at 731).

Jamal claims that the jury returned so quickly on its second day of deliberations because the district court, by allowing other matters to take precedence over his attendance for jury deliberations, had led the jury to believe that this case was not

25

important.  He can provide no support for this claim.  Even if the district court committed error in leaving the jury in the care of another district judge, which it did not, Jamal cannot provide any evidence to support his claim that any substantial right was affected.

He provides one final argument regarding the district court's conduct during the trial, namely that the district court had shortened the time defense counsel had to argue his case, which did not afford him an adequate opportunity to explain the case to the jury and did not permit the defense to call all of its witnesses.  The defense did not attempt to call the witnesses it claims to have been deterred from calling, and cannot now charge the district court with its trial tactics decisions.  The district court permitted extensive argument about jury instructions as well as lengthy sidebars during trial.  While it limited closing arguments to forty-five minutes per side, such a limit was not unreasonable and was within its discretion.  *United States v. Dye*, 508 F.2d 1226, 1231 (6th Cir. 1974).  As Jamal has provided no support for his claim that the district court committed error during jury deliberations, this court affirms the district court's actions.

7.    Subsequent Conduct Evidence

Jamal contends that the district court prevented him from calling witnesses who could testify as to his actions after he received asylum.  He argues this testimony was relevant to demonstrate a lack of concern about his immigration status, from which the jury could have inferred that he had an innocent state of mind.  According to Jamal, there were potential witnesses who were the subject of subpoenas and, had they been required to testify truthfully, they would have given evidence that Jamal worked closely with agencies

26

that enforced immigration laws, with no evident concern that he would be the subject of scrutiny.

In his appellate brief, Jamal provides no argument or legal support for this contention and gives no indication of any action by the district court that denied him the opportunity to produce such testimony. A search of the record reveals that the district court did quash subpoenas issued to various public servants and employees of government agencies at the government's expense, pursuant to Fed. R. Crim. P. 17(b), and that it issued its opinion on the matter under seal.

A criminal defendant may make a motion requesting that the district court serve a witness with a subpoena at government expense. Fed. R. Crim. P. 17(b). In doing so, he must demonstrate that he is indigent, and must make a sufficient showing that the witness is necessary for his defense. *Id.* "In this determination, the District Court is vested with a wide discretion, and a reviewing court should not reverse unless the exceptional circumstances of the case indicate that [a] defendant's right to a complete, fair and adequate trial is jeopardized." *United States v. Rigdon*, 459 F.2d 379, 380 (6th Cir. 1972) (internal citations and quotations omitted).

Jamal argued that he would suffer prejudice if he could not present the jury with evidence of his actions after he obtained asylum. The district court reviewed the affidavits of the witnesses subpoenaed by Jamal and found that none of them could offer relevant evidence concerning Jamal's state of mind during the relevant time period. Once he had asylum status, Jamal was, by all appearances, legally residing in the United States.

27

Accordingly, he participated in community events and interacted with various community leaders. None of those community leaders could provide more than passive observations of Jamal. The district court properly found that evidence that Jamal was merely involved in the community is irrelevant to the question of whether he knowingly and intentionally misrepresented facts to obtain asylum status.

8.      Transfer of Venue

Jamal's final argument is that the trial court improperly denied his pre- and post-trial motions for transfer of venue under Fed. R. Crim. P. 21. Under the Federal Rules of Criminal Procedure, a criminal defendant may move for a change of venue on two grounds: if the defendant faces prejudice such that he cannot receive a fair and impartial trial; or if it is more convenient for the parties and witnesses that the forum be changed, and such a change is in the interest of justice. Fed. R. Crim. P. 21(a) and (b). We review the district court's decision on a defendant's motion for a transfer of venue for an abuse of discretion. *United States v. Jamieson*, 427 F.3d 394, 412 (6th Cir. 2005), *reh'g en banc denied*, 2006 U.S. App. LEXIS 4080 (6th Cir. 2006).

The Supreme Court has set forth a series of factors for a district court to consider when deciding whether to transfer venue in the interest of justice. Among these are the location of witnesses, the location of documents and records, the expense to the parties, and the location of counsel. *See Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240 (1964).

At the time of the trial, Jamal lived in St. Paul, Minnesota. He filed a motion prior

28

to trial requesting a transfer of venue on the basis of convenience, citing the fact that he, his witnesses, and his attorneys lived in Minnesota, and the necessity of traveling to Memphis, Tennessee, would create obstacles to his defense. He further submitted that the language of the criminal rule mandated transfer to Minnesota. Finally, he noted that none of the government's witnesses were located in Memphis, so there would be little if any hardship to the government if a transfer of venue were granted.

The government responded to this motion by noting that Jamal could only speculate as to the location of the government's witnesses, because their identities had not been disclosed at that time. Further, it argued that his motion was untimely because it was not filed until a month and a half after the arraignment, citing *United States v. Blankenship*, 870 F.2d 326, 330 (6th Cir. 1998).

The district court denied Jamal's motion to transfer venue. Its decision was based largely on its impression that Jamal was attempting to forum shop, as was indicated by the following statement in Jamal's motion:

> Although the locale with respect to selecting a jury of one's peers is certainly more relevant after the venire has been questioned, differences in the makeup of the two communities at issue also weighs in the interest of fairness in this case. Mr. Jamal is a spokesperson of national, and international note, who resides in Minnesota *specifically because it has become [] home [to] the largest number of Somali immigrants in the US*, and Mr. Jamal's reputation, character and his actions in Minnesota, all of which indicate his factual innocence, will be an integral part of his defense at trial.

(J.A. 107-108).

The district court's decision denying Jamal's motion was not an abuse of discretion.

A defendant does not have the right to shop for a forum in which his criminal case may be heard. The government filed a memorandum objecting to a transfer of venue, thereby indicating that the proposed new venue was not convenient for both parties. The criminal rules require that a transfer for convenience satisfy the convenience of *both* parties. Fed. R. Crim. P. 21(b). In addition, Jamal is simply incorrect that the criminal rule *mandates* a transfer for the parties' convenience. That decision is within the discretion of the district court, as indicated by the rule's use of the word "may." *Id*. We affirm the decision of the district court denying Jamal's motion to transfer venue.

## CONCLUSION

For the reasons set forth above, each of the errors assigned by Jamal is without merit. We affirm the judgment of the district court.